RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE  8 / 16 / 12

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

LORI GUILLOT FIRMIN,                    CIVIL ACTION
           Appellant                    1:11-cv-01875

VERSUS

U.S. COMMISSIONER OF SOCIAL             JUDGE DEE D. DRELL
SECURITY,                               MAGISTRATE JUDGE JAMES D. KIRK
           Appellee

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Lori Guillot Firmin ("Firmin") filed an application for social security disability insurance benefits ("DIB") on November 25, 2009, alleging a disability onset date of April 25, 2009 (Tr. p. 116) due to "deteriorated discs" (Tr. p. 238); Firmin was 36 years old (Tr. p. 116). That application was denied by the Social Security Administration ("SSA") (Tr. p. 79).

A de novo hearing was held before an administrative law judge ("ALJ") on January 19, 2011, at which Firmin appeared with her attorney and a witness (Tr. p. 45). The ALJ found that, although Firmin has severe impairments of status post open transforaminal lumbar interbody fusion ("TLIF"), status post lumbar microdiscectomy L4-5 with facet fusion bilaterally, and brachial neuritis radiculitis (Tr. p. 34), she had the residual functional capacity to perform less than the full range of sedentary work and

less than a forty-hour work week from April 25, 2009 through August 27, 2010, and thus was under a disability from April 25, 2009 through August 27, 2010 (Tr. pp. 35-37).   The ALJ also found that Firmin was not disabled as of August 28, 2010 due to medical improvement and had the residual functional capacity to perform the full range of light work (Tr. pp. 37-38), so a finding of "not disabled" as of August 28, 2010, through the date of his decision on April 6, 2011, was dictated by Rule 202.21 of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (Tr. p. 40).

Firmin requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Firmin next filed this appeal for judicial review of the Commissioner's final decision.   Firmin raises the following issues for review on appeal (Doc. 9):

> 1. The ALJ failed to discuss why he did not find Firmin meets the requirements of 20 C.F.R. part 404, Subpart P, Appendix 1, Listing 1.04.
>
> 2. Reliance on the Medical-Vocational Guidelines was inappropriate in view of the nonexertional impairment in use of the right upper extremity, and the Commissioner's burden of proof at the final step in the sequential evaluation process is not satisfied.
>
> 3. The decision does not comply with 20 C.F.R. § 404.1594, which explains the process for terminating benefits on the basis of medical improvement.
>
> 4. The Appeals Council erred in declining to remand for consideration of the evidence submitted after issuance of the ALJ's decision.

The Commissioner filed a brief in response to Firmin's appeal (Doc. 10), to which Firmin filed a reply (Doc. 11). Firmin's appeal is now before the court for disposition.

<u>Summary of Pertinent Facts</u>

1. Medical Records

Firmin underwent ankle surgery in 2006 and a lumbar fusion in September 2008 for a central herniated nucleus pulposus, L4-L5, with radiculopathy (Tr. pp. 247, 418-440, 564). Firmin was noted to be morbidly obese; she was 5'6" tall and weighed 240 pounds (Tr. pp. 427, 430, 433, 436, 438).

In December 2008, Firmin was found to be depressed and was prescribed Paxil (Tr. pp. 224-230).

In May 2009, Firmin complained of sweating and diarrhea, her blood pressure was elevated (153/102), and she was nauseated; Firmin weighed 237 pounds (Tr. p. 221).

Firmin underwent an MRI of her lumbar spine on May 13, 2009, which showed severe degenerative disc change and modic type I vertebral body end plate changes at L4-5 with an almost bone-on-bone situation at L4-5 (Tr. p. 259, 307). The MRI also showed previous post-surgical laminectomy-type changes at L4-5 on the left with recurrent disc herniation and associated bilateral nerve root canal narrowing, small to moderate-sized posterior central/left paracentral disc herniation at L5-S1 contributing to fairly significant nerve root canal narrowing (especially on the left), a posterior bulging of the disc at L3-4 without significant compressive signs, and some right hydronephrosis (Tr. p. 260, 308).

3

X-rays in May 2009 showed very limited mobility on flexion and extension with degenerative changes at L4-L5 and L5-S1 (Tr. pp. 290, 309). On May 29, 2009, Dr. Stephen Katz, an anesthesiologist and pain management doctor, diagnosed intervertebral disc disease and failed back syndrome, noted Firmin was scheduled for surgery with Dr. Sin, and prescribed Oxycontin, Percocet, and Flexeril (Tr. p. 258).

On June 25, 2009, Firmin underwent an L4 bilateral laminectomy, foramenotomy and total facetectomy (decompression) with Dr. Anthony Sin, a general surgeon (Tr. pp. 268-270, 302-305, 560-563). Post-surgery, Firmin's diagnoses were degenerative disk disease and lumbar stenosis with questionable instability (Tr. p. 266).

X-rays in July 2009 showed the post-operative changes of laminectomy and transpedicular fusion at L4-5 and moderate spondylosis (Tr. pp. 272, 310). X-rays in September 2009 showed Firmin had undergone lumbar interbody fusion at L4-L5 and the lumbar vertebrae were well-aligned, though there was some narrowing of the L5-S1 interspace (Tr. pp. 271, 311).

In July 2009, a CT scan of Firmin's chest showed no evidence of pulmonary embolism and a tiny left pleural effusion (Tr. p. 245), and an ultrasound of Firmin's lower extremities showed no abnormalities (Tr. p. 246). Dr. Dixie Broussard, a family medicine doctor, noted that Firmin had hypertension, elevated cholesterol, depression, chronic low back pain, and endometriosis (Tr. p. 215). Firmin was taking Xanax, Flexeril, Zyprexa, Paxil, Oxycontin,

4

Hyzaar, and Crestor (Tr. p. 215).   Firmin was also found to be anemic and was prescribed ferrous sulfate (Tr. pp. 213-214).

On August 28, 2009, progress notes showed Firmin was recovering from surgery and taking Percocet and Flexeril (Tr. pp. 256, 476).

In September 2009, Dr. Sin noted Firmin was 5'7" tall, weighted 230 pounds, and had a well-healed incision (Tr. p. 292); he recommended Firmin exercise by walking (Tr. p. 293).   In December 2009, Dr. Sin discontinued Firmin's use of a brace, noted she had no left leg pain and felt better overall, recommended water therapy, and did not recommend bending or returning to work yet (Tr. p. 294).

In February 2010, Dr. Gerald Dzurik, a pediatrician, filled out a physical residual functional capacity assessment on Firmin from a review of her medical records (Tr. pp. 320-327).   Dr. Dzurik found that Firmin could occasionally lift/carry ten pounds, frequently lift/carry ten pounds, stand/walk at least two hours in an eight-hour workday, sit for a total of six hours in an eight-hour work day, and do unlimited pushing and pulling (Tr. p. 321). Dr. Dzurik further found that Firmin should never balance, could frequently stoop, and could occasionally climb, kneel, crouch, and crawl (Tr. p. 322).   Dr. Dzurik stated that Firmin's alleged physical limitations were credible (Tr. p. 325).

Also, in February 2010, William Berzman, Ph.D. reviewed Firmin's medical records, filled out a psychiatric technique review form, and found Firmin has non-severe depressive symptoms which

cause some mild restrictions in daily living (Tr. pp. 340-342).

In January and April 2010, Dr. Katz prescribed Hydrocodone, Flexeril, and physical therapy for Firmin's intervertebral disc disease and failed back syndrome with cervical radiculopathy (Tr. pp. 460, 466). In May 2010, Dr. Katz changed her medications to Percocet and Flexeril and noted her cervical radiculopathy was responding to physical therapy (Tr. pp. 458-459).

X-rays taken of Firmin's shoulder in March 2010 showed moderate degenerative change of the AC joint with deformity of the distal clavicle that appeared to be from an old fracture (Tr. p. 576).

In May 2010, Dr. Joseph Landreneau, a cardiovascular disease doctor, treated Firmin (Tr. p. 398). Dr. Landreneau found Firmin was 37 years old, had hypertension, hyperlipidemia, and atypical mild chest pain (Tr. pp. 397-398). Dr. Landreneau prescribed a low sodium diet (Tr. p. 397). In June 2010, Dr. Landreneau found Firmin weighed 234 pounds, her blood pressure was 110/64, and her calcium score was in the high normal range (Tr. p. 392). Dr. Landreneau diagnosed hypertension, fatigue, left ventricular hypertrophy, and mild calcium score elevation (Tr. p. 392); he changed Firmin's medication from Toprol to Lopressor (Tr. p. 392). Dr. Landreneau also advised Firmin to exercise routinely, lose weight, and reduce stress (Tr. p. 391).

An MRI of Firmin's cervical spine in April 2010 showed a central disc herniation at C6-7 with foraminal stenosis, and Dr. Sin prescribed physical therapy (Tr. pp. 21-22). In June 2010, Dr.

Sin found Firmin weighed 230 pounds, she reported physical therapy helped with her back pain a little, she still had back and neck pain but no leg pain, and her back fusion looked good (Tr. pp. 18-19).

In August 2010, Dr. Landreneau found Firmin weighed 248 pounds, her blood pressure was up in the mornings, she had occasional dizziness, and she awoke feeling very fatigued (Tr. p. 579). Firmin had a negative stress echocardiogram for ischemia and mild left ventricular hypertrophy (Tr. pp. 589-590). Dr. Landreneau diagnosed hypertension and left ventricular hypertrophy, and scheduled a sleep study (Tr. p. 579). The polysomnogram showed obstructive sleep apnea, and a CPAP machine was initiated (Tr. pp. 584-585). Firmin's Percocet and Flexeril prescriptions were continued (Tr. p. 596).

In December 2010, Dr. Katz examined Firmin for failed back syndrome secondary to previous anterior cervical disc fusion and intervertebral disc disease (Tr. p. 17). Dr. Katz noted that Firmin's pain was well-controlled with Percocet and Flexeril, but she complained of wrist pain from carpal tunnel (Tr. p. 17). In January and February 2011, Dr. Katz gave Firmin epidural steroid injections at C6-7 (Tr. pp. 13-15). In June 2011, Dr. Katz noted Firmin's increased pain and discomfort, changed her Percocet to Roxicodone, and also prescribed Zanaflex (Tr. p. 10).

### 2. January 2011 Administrative Hearing

An administrative hearing was held on January 19, 2011, at which Firmin appeared with her attorney and a witness (Tr. p. 45).

7

Firmin testified that she was 37 years old, had a high school education and EMT training, is left-handed, is 5'6" tall, weighed about 220 pounds, and had gained a lot of weight in the last year (Tr. pp. 48-50). Firmin testified that she lives with her husband and twelve year old son and she drives a car (Tr. p. 49). Firmin testified that she has worked as a secretary and a ward clerk at a hospital, and as a sales clerk, a filing clerk, and a secretary (Tr. pp. 50-51). Firmin testified that she last worked in April 2009 (Tr. p. 52).

Firmin testified that she stopped working in 2009 because her back began hurting and she began having difficulty getting up and walking after sitting down because her legs were numb (Tr. p. 51). Firmin testified that she had her first back surgery in 2008 (Tr. p. 51). Firmin testified she had her second back surgery in June 2009 due to numbness and tingling in her legs (Tr. p. 52). Following the second surgery, Firmin had physical therapy for about six weeks; the physical therapy helped a little (Tr. p. 52). Firmin testified that she still has pain and numbness down her leg and an arm (Tr. p. 52). Firmin testified that, after Dr. Sin released her in 2010, she called and told him she had pain down her neck (Tr. pp. 53-54). Dr. Sin ordered an MRI which showed a herniated disc in Firmin's neck (Tr. p. 54). Firmin testified that Dr. Katz started giving her epidural shots for pain, and she still takes Percocet and Flexeril (Tr. pp. 54-55). Firmin testified that she sees Dr. Katz every three months (Tr. p. 55). Firmin also takes Paxil and Zyprexa for depression, which are prescribed by her

family doctor (Tr. p. 58).  Firmin does not see a mental health professional (Tr. p. 58).

Firmin testified that she had a fusion surgery in 2008 that did not help, Dr. Katz started prescribing pain medication for Firmin (Tr. p. 63), she had her second surgery in 2009 but it did not really help, either, and Dr. Katz diagnosed failed back syndrome[1] in 2010 and began administering epidural shots for pain (Tr. pp. 63-64).  Firmin testified that she now has a cervical herniation, but she is not sure whether her back or her neck hurts worse (Tr. p. 64).

Firmin testified that, on a typical day, she gets up and gets her son ready for school, takes him to school, then goes home and sits on a heating pad; she stays home most of the day, sitting or laying on her heating pad (Tr. pp. 55-56, 68).  Firmin testified that also she does light housework, laundry, and grocery shops; Firmin carries light bags or grocery shops in the evening with her husband (Tr. p. 56).  Firmin testified that she sits and rests during housework, so it takes her about three days to clean the entire house (Tr. p. 56).

Firmin testified that her doctors recommended she lose weight, so she walks for about fifteen minutes a day (Tr. pp. 56-57).  Firmin testified that she goes camping with her family, does a

_____

[1] Failed Back Surgery syndrome (also called FBSS, or failed back syndrome) is a misnomer, as it is not actually a syndrome - it is a very generalized term that is often used to describe the condition of patients who have not had a successful result with back surgery or spine surgery.  American Chronic pain Association, "Failed Back Surgery Syndrome," *available at* http://www.theacpa.org/conditionDetail.aspx?id=20.

little sewing (which is hard due to her hand being numb), helps her son with homework, and uses a computer to surf the internet and email (Tr. pp. 557-58).  Firmin also has a small dog, reads during the day for about ten minutes at a time, and sees her parents every day (they live across the street from her) (Tr. p. 59).  Firmin testified that she would like to try to return to work (Tr. p. 59), but needs time to "get situated" and recoup (Tr. p. 61).  Firmin testified that she quit her job at the Avoyelles Hospital because she could not sit for hours at a time (Tr. p. 60).  Firmin testified that she drives her car every day because she takes her son to school and picks him up after school (Tr. p. 60).  Firmin testified that she is unable to socialize with other people right now (Tr. p. 61).

Firmin testified that her job at Avoyelles Hospital was secretarial, she did not have to lift anything except paper (up to five or ten pounds), and she sat down to work, but would get up and walk around some (Tr. pp. 61-62).

Firmin testified that she has difficulty looking down, and she has to sit "a certain way" in her chair (Tr. pp. 64-65).  Firmin testified that, when sitting in a chair, she can look down for about ten minutes, then has to lift her head up again for five to ten minutes before she can look down again (Tr. p. 65).  Firmin testified that she is left-handed, and that her cervical problems cause tingling in her fingers which makes it difficult for her to hold heavy things (like a gallon of milk) with her right hand or to pick things up with her right hand (Tr. pp. 65-66).  Firmin also

10

testified that she has difficulty keyboarding with her right hand due to numbness, and has trouble turning a doorknob with her right hand (Tr. p. 66).

Firmin testified that she sleeps a lot because her pain medication makes her sleepy, so she naps about two hours during the day and has to recline an hour (Tr. p. 67).  Firmin testified that, due to her need to lie down during the day, and her inability to sit very long, she would not be able to work full time at a sedentary job (Tr. pp. 67-68).

Gilda Guillot,[2] Firmin's mother, testified that she sees Firmin every day, and that Firmin has a lot problems with her back and neck; some, but not all, of her pain has gone away (Tr. pp. 69-70).  Guillot testified that Firmin is able to do a little bit of housework, but not too many chores (Tr. p. 70).  Guillot testified that she cooks often for Firmin's son because Firmin is usually on a heating pad or not feeling good (Tr. p. 70).  Guillot testified that Firmin's son spends most of the time that he is not in school at Guillot's house.  Guillot also testified that, when Firmin takes her medicine, she wants to sleep and has difficulty talking (Tr. p. 71).

## ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine

---

[2] Guillot's name erroneously appears as "Ghio" in the transcript.

whether Firmin (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

However, in cases involving a closed period of disability, the ALJ must decide when the payment of benefits should be terminated pursuant to the medical improvement standard.  Under the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled.  Waters v. Barnhart, 276 F.3d 716 (5th Cir. 2002).  Under the medical improvement standard, disability benefits may be terminated if there is substantial evidence demonstrating that:

> (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and
> (B) the individual is now able to engage in substantial gainful activity.

42 U.S.C. § 423(f)(1). The burden rests on the government to show that the claimant's disability has ended as of the cessation date. Joseph v. Astrue, 231 Fed.Appx. 327 (5th Cir. 2007), cert. den., 552 U.S. 1111, 128 S.Ct. 900 (2008). There is an eight-step sequential process, in 20 C.F.R. § 1594(f), for evaluating possible terminations:

> (1) Is the claimant engaged in substantial gainful activity? (If so, the disability has ended.)
> (2) If not, does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1? (If so, the disability is continuing.)
> (3) If not, has there been medical improvement?
> (4) If there has been medical improvement, is it related to the claimant's ability to do work?
> (5) If there has been no medical improvement, or if the medical improvement is not related to the claimant's ability to do work, is one of the exceptions to medical improvement applicable? (If not, the disability is continuing.)
> (6) If there has been medical improvement related to the claimant's ability to do work, or if one of the first group of exceptions is applicable, is the combination of impairments severe? (If not, the disability has ended.)
> (7) If so, is the claimant able to engage in past relevant work? (If so, the disability has ended.)
> (8) If not, is the claimant able to perform other substantial gainful activity?

In the case at bar, the ALJ found that Firmin has not engaged in substantial gainful activity since Aril 25, 2009 (Tr. p. 34), and that she has severe impairments of status post open transforaminal lumbar interbody fusion ("TLIF"), status post lumbar microdiscectomy L4-5 with facet fusion bilaterally, and brachial

neuritis radiculitis (Tr. p. 34), but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. pp. 35, 37). The ALJ also found that Firmin was unable to perform her past relevant work from April 25, 2009 through August 27, 2010 (Tr. p. 36), and continues to be unable to perform her past relevant work (Tr. p. 40).

At Step No. 5 of the sequential process, the ALJ further found that, from April 25, 2009 through August 27, 2010, Firmin had the residual functional capacity to perform less than the full range of sedentary work and less than a forty-hour work, and thus was entitled to a closed period of disability from April 25, 2009 through August 27, 2010 (Tr. pp. 35-37).

The ALJ further found that Firmin's period of disability ended as of August 28, 2010 due to medical improvement resulting in the residual functional capacity to perform the full range of light work (Tr. pp. 37-38). The ALJ concluded that a finding of "not disabled," from August 28, 2010 through the date of his decision on April 6, 2011, was dictated by Rule 202.21 of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (Tr. p. 40).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d

14

152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

<u>Law and Analysis</u>

<u>Issue 1 - Listing 1.04</u>

Firmin contends the ALJ erred in failing to discuss why he did not find that she meets the requirements of Listing 1.04(A) or (B). Firmin contends that her period of disability, from April 25, 2009 through August 27, 2010, should have been based on this listing.

The ALJ found Firmin was disabled from April 25, 2009 through August 27, 2010, but did not find that Firmin met Listing 1.04 during that time.  Firmin contends she was prejudiced from the ALJ's failure to find her disabled pursuant to Listing 1.04 because, had he found she met the listing, he would not have found her disability had ended due to the different burden of proof.  Firmin argues that, had the ALJ found she was disabled pursuant to Listing 1.04, she would have been deemed unable to engage in substantial gainful activity.  In other words, Firmin appears to argue that the ALJ could not have found her condition had medically improved if he had found she met a listing during her period of disability.

Regardless of any differences in the burden of proof, Firmin's argument is meritless because she did not carry her burden of proving she met Listing 1.04.

If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled.  <u>Cieutat v. Bowen</u>, 824 F.2d 348, 351 n.1 (5th Cir. 1987).  Also, <u>Selders v. Sullivan</u>, 914 F.2d 614, 619 n. 1 (5th Cir. 1990).  A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1.  <u>Sullivan v.</u>

16

Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-92, 107 L. Ed. 2d 967 (1990). See also, Selders v. Sullivan, 914 F. 2d 614, 619(5th Cir. 1990). For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. Sullivan v. Zebley, 110 S. Ct. at 891.

Listing 1.04(A)-(B) states:

1.04. Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
 A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness, or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
 B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

The ALJ found that Firmin did not meet a listing, and adopted the reasoning of the state agency physicians on that issue. Dr. Dzurik found that, physically, Firmin can do sedentary work (Tr. pp. 321, 325), and Dr. Berzman found Firmin's depression is not severe (Tr. p. 330). Firmin has not adduced medical evidence of motor loss, nor is there any medical evidence (operative note, pathology report, imaging) of spinal arachnoiditis, which would meet Listing 1.04. Therefore, the ALJ did not err in finding that Firmin does not meet a Listing 1.04.

17

Moreover, Firmin's argument that the ALJ could not have found Firmin's disability ended had he found she met a listing is also meritless.  Firmin appears to contend that a finding that she meets a listing means she will never again be found able to work-that there can never be medical improvement.  However, pursuant to 20 C.F.R. 404.1594(c)(3)(i), if evidence shows the claimant has medical improvement to a degree that she no longer meets a listing, it is *assumed* that the medical improvement is related to the ability to work and a residual functional capacity evaluation is then made. At Step 2 of the eight-step sequential process for evaluating possible disability terminations, the ALJ must determine (again) whether the claimant has an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1.  Therefore, that issue is re-visited during a termination analysis.

In the case at bar, the ALJ did not expressly state that Firmin did not meet Listing 1.04 when he made the termination analysis. However, since the ALJ expressly found Firmin did not meet a listing when she was disabled and entitled to a prior closed period of disability, and the ALJ then found she had medical improvement which was presumably related to her ability to work, it is a given that the ALJ would not find that Firmin met a listing when she was medically improved, that she did not meet when she was found to be disabled.  It is noted that the medical evidence does not show that Firmin met Listing 1.04 after her closed period of disability ended.

Since substantial evidence supports the ALJ's/Commissioner's

finding that Firmin did not meet a listing at any time, and the ALJ applied the correct standard for evaluating whether Firmin's disability had terminated, this argument is meritless.

Issue 2 - Medical-Vocational Guidelines

Next, Firmin contends the ALJ erred in relying on the Medical-Vocational Guidelines after Firmin's period of disability ended. Firmin contends her cervical disc herniation is a non-exertional impairment which made it inappropriate for the ALJ to rely on the Medical-Vocational Guidelines.

Generally, the Guidelines may not be applied when a claimant suffers solely from a nonexertional impairment. Pate v. Heckler, 777 F.2d 1022, 1026 (5th Cir. 1985), citing Martin v. Heckler, 748 F.2d 1027, 1034-35 (5th Cir. 1984). Also, Broussard v. Bowen, 828 F.2d 310, 313 (5th Cir. 1987); Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986). Since the Guidelines are predicated on an individual's having an impairment which manifests itself by limitations in meeting strength requirements of jobs, they may not be fully applicable where the nature of an individual's impairment does not result in such limitations, e.g. certain mental, sensory, or skin impairments. The rules do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional types of impairments. 20 C.F.R. Subpt. P, App. 2, §200.00(e). Broussard v. Bowen, 828 F.2d 310, 313 (5th Cir. 1987).

There are two exceptions to these general precepts. First, even when a claimant has a nonexertional impairment, the Commissioner may nevertheless rely exclusively on the grids to determine whether work

exists in the national economy which claimant can perform if (a) the ALJ determines that the nonexertional impairment does not significantly affect the claimant's RFC, and (b) substantial evidence supports that determination. Newton v. Apfel, 209 F.3d 448, 458 (5th Cir.2000), citing Fraga v. Bowen, 810 F.2d 1296, 1304 (5th Cir.1987). Second, even when a claimant's residual functional capacity is so significantly affected by a nonexertional impairment as to preclude resort to the grids for a disability determination, the grids may nevertheless be consulted as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." 20 C.F.R. pt. 404, Subpt. P, App.2, § 200.00(§ e)(2)(2001). Thus, the Guidelines can be used to determine disability, provided that the nonexertional impairments do not significantly diminish the claimant's residual capacity to perform the activities listed in them. Evans v. Chater, 84 F.3d 1054, 1056 (8th Cir. 1996), and cases cited therein.

Firmin claims her cervical disc herniation creates pain which precludes her from working. Although a claimant's assertion of pain or other symptoms must be considered by the ALJ, 42 U.S.C. § 423(d)(5)(A) requires that a claimant produce objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged. Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989), citing Owens v. Heckler, 770 F.2d 1276, 1281 (5th Cir. 1985). A claimant's symptoms, including pain, will be determined to diminish a claimant's capacity for basic work activities to the

extent that the claimant's alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §404.1529(c)(4). Also, Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2000). Although severe pain can constitute a nonexertional impairment, pain is a disabling condition only when it is constant, unremitting and wholly unresponsive to therapeutic treatment. Chambliss, 269 F.3d at 522.

The mere existence of pain is not an automatic ground for obtaining disability benefits. The factual determination of whether the claimant is able to work despite some pain is within the discretion of the Administrative Law Judge and will be upheld if supported by substantial evidence. Fortenberry v. Harris, 612 F.2d 947, 950 (5th Cir. 1980). While pain can be severe enough to create a disabling condition, the evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. Elzy v. Railroad Retirement Bd., 782 F.2d 1223, 1225 (5th Cir. 1986); Loya v. Heckler, 707 F.2d 211, 215 (5th Cir. 1983). Also, Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Wren v. Sullivan, 925 F.2d 123, 128-29 (5th Cir. 1991). Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints. Falco v. Shalala, 27 F.3d 162, 163-64 (5th Cir. 1994).

The ALJ found Firmin was entitled to a period of disability

from April 25, 2009 (the date Firmin claimed she became unable to work) through August 27, 2010 due to her back problems and surgeries (Tr. pp. 35-37).  The ALJ found that Firmin was not disabled as of August 28, 2010 due to medical improvement and had the residual functional capacity to perform the full range of light work.  The ALJ made the following findings as to Firmin's pain and credibility (Tr. p. 39):

> "According to an office visit note dated September 18, 2009 from Dr. Sin, the claimant had improved and should continue to improve.  On April 9, 2010 the claimant presented to Dr. Sin for follow-up to her physical therapy.  The claimant reported stretching exercises helped.  She does have continued back pain, but no leg pain.  She further reported neck pain, with bilateral upper extremity pain, with the right being worse than the left and numbness and tingling in the right arm.  Dr. Sin noted central disc herniation at C6/7 with foraminal stenosis.  She had good short-term relief with steroids and he recommended she try physical therapy before more aggressive treatment options.  Dr. Sin noted her radiographic studies looked 'good' and she was almost completely fused and 'healing well.'

> "After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible beginning on August 28, 2010, to the extent they are inconsistent wit the residual functional capacity assessment for the reasons explained below.

> "It does not appear that the claimant has had to obtain medical treatment after August 27, 2010 for her alleged symptoms, as there is no treatment records [sic] associated with this claim since that time.  This would lead one to believe her symptoms are not as bothersome as they had been.  Furthermore, the claimant testified she only sees Dr. Katz every three months.

> "The documentary evidence and hearing testimony reveal the claimant is quite active despite her alleged symptoms and limitations.  The claimant gets her son ready for school; takes him to school; she is able to do light

household chores; shops every other day for an hour or two; prepares meals, cares for her dog (feeds, bathes and walks her); cares for her personal needs independently; uses the computer to 'surf' the internet and check her e-mails.  Her hobbies include taking pictures, camping and sewing.  She further testified that her physician advised her to lose weight and exercise, so she walks about 15 minutes per day."  (Tr. p. 39).

The evidence shows that, in July 2010, Firmin had upper right extremity and neck pain which developed due to a cervical disc herniation which was found in March 2010 (Tr. pp. 551-553); although Firmin had pain on rotation of her neck and tingling in her arms, she did not have any loss of cervical motor function (Tr. p. 551). Dr. Sin noted Firmin had good short term pain relief with steroids, and recommended physical therapy (including flexibility and cervical traction) and epidural steroid injections (Tr. pp. 552-553).  Dr. Sin further stated that Firmin's cervical disc was central and difficult to treat with posterior foraminotomy (Tr. p. 553).  There are records of Firmin receiving the epidural injections and other pain medication from Dr. Katz in 2010 and 2011 (Tr. pp. 10-13), but there are no records showing that Firmin underwent physical therapy as prescribed by Dr. Sin in July 2010 (Tr. p. 552).

Since the ALJ in this case has made the mandatory indication of the basis for his credibility choices concerning claimant's complaints, and since his choices are not unreasonable, his finding that Firmin's pain from her herniated cervical disc would not prevent her from performing work is proper.  Carry v. Heckler, 750 F.2d 479, 485-86 (5th Cir. 1985).  Compare, Hernandez v. Shalala, 41 F.3d 665 (5th Cir. 1994). Substantial evidence supports the Commissioner's conclusion that Firmin is not disabled by pain.

This ground for relief is meritless.

Issue 4 - Termination of Benefits

Next, Firmin contends the ALJ's decision does not comply with 20 C.F.R. § 404.1594, which explains the process for terminating benefits on the basis of medical improvement.

In cases involving a closed period of disability, the ALJ must decide when the payments of benefits should be terminated pursuant to the medical improvement standard.  Under the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled.  Waters v. Barnhart, 276 F.3d 716 (5th Cir. 2002).  Under the medical improvement standard, disability benefits may be terminated if there is substantial evidence demonstrating that:

> (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and
> (B) the individual is now able to engage in substantial gainful activity.

42 U.S.C. § 423(f)(1). The burden rests on the government to show that the claimant's disability has ended as of the cessation date. Joseph v. Astrue, 231 Fed.Appx. 327 (5th Cir. 2007), cert. den., 552 U.S. 1111, 128 S.Ct. 900 (2008).  There is an eight-step sequential process, in 20 C.F.R. § 1594(f), for evaluating possible terminations:

> (1) Is the claimant engaged in substantial gainful activity? (If so, the disability has ended.)
> (2) If not, does the claimant have an impairment of combination of impairments which meets or equals the severity of an impairment listed in Appendix 1? (If so, the disability is continuing.)
> (3) If not, has there been medical improvement?

24

(4) If there has been medical improvement, is it related to the claimant's ability to do work?
(5) If there has been no medical improvement, or if the medical improvement is not related to the claimant's ability to do work, is one of the exceptions to medical improvement applicable? (If not, the disability is continuing.)
(6) If there has been medical improvement related to the claimant's ability to do work, or if one of the first group of exceptions is applicable, is the combination of impairments severe? (If not, the disability has ended.)
(7) If so, is the claimant able to engage in past relevant work? (If so, the disability has ended.)
(8) If not, is the claimant able to perform other substantial gainful activity?

Section 404.1594 states that medical improvement is a decrease in the medical severity of the impairments which were present at the time of the most recent favorable medical decision of disability. 20 C.F.R. § 404.1594(b)(1).  The determination of a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the] impairment(s). 20 C.F.R. § 404.1594(b)(1). Additionally, a medical improvement is related to the ability to do work if the improvement creates an increase in the functional capacity to do basic work activities.  20 C.F.R. § 404.1594(b)(3).  Finally, substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit.  Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  The ability to engage in substantial gainful activity is determined through an objective assessment of the functional capacity to do basic work activities and a consideration of vocational factors.  20 C.F.R. § 404.1594(b)(5).

The ALJ's opinion set forth above indicates that he based his

finding of medical improvement on Firmin's medical records; Firmin's leg pain was gone, her back pain was improved, and her cervical pain (on rotation of her neck) did not cause a loss of motor function and responded well to medication.  The ALJ found that Firmin can do work based on her residual functional capacity assessment, her medical records, and her own statements, both written and verbal, as to her everyday activities.

Since the ALJ made the assessment for termination of disability required under Section 404.1594, substantial evidence supports the Commissioner's finding that Firmin's disability had ended.  This ground for relief is meritless.

Issue 5 - Appeals Council

Finally, Firmin contends the Appeals Council erred in declining to remand for consideration of the evidence submitted after issuance of the ALJ's decision.

Firmin's administrative hearing was on January 19, 2011 and the ALJ's decision was issued on June 6, 2011.  Firmin has not explained why her more recent medical records from Dr. Sin, dated from August 9, 2010 through December 29, 2010, and from Dr. Katz, dated December 6, 2010 through June 2, 2011, were not submitted to the ALJ.[3] However, as the government states in its brief, and as stated by the Appeals Council in its notice to Firmin (Tr. pp. 1-2), those records do not provide a basis for changing the ALJ's decision.  In other words, those records do not present evidence that indicates Firmin's

_____

[3] The most recent medical record before the ALJ was dated November 9, 2010 (Tr. p. 592).

medical condition deteriorated, between the date of the last medical record before the ALJ (November 9, 2010) and the date of the last medical record submitted to the Appeals Council (June 2, 2011), to a point that rendered her unable to work.  Pertinent to that finding is Firmin's description of her daily activities, given at her hearing in January 2011, which supports the ALJ's findings and conclusions.

Therefore, the Appeals Council did not err in declining to review and remand Firmin's claim.  This argument is also meritless.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Firmin's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND**

27

**LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this _____

day of August 2012.


JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE